Second case of this morning, second and last case of this morning, United States v. United States Sugar Corporation at all, number 22-2806, Mr. Bozzo and Ms. Sherry. Take your time setting up, there's no urgency. Take your time setting up, there's no urgency. May it please the court, Peter Butzo for the United States. I'd like to reserve seven minutes for rebuttal. The defendant's merger brings together and eliminates all competition between two of the Southeast's largest sugar refiners. These two competitors operate facilities, refineries, that take raw cane sugar and transform it into the refined sugar that gets incorporated into food products that households across the country consume every day. The merger threatens to increase prices for this household staple for customers across 12 states. We're pretty familiar with the facts. As I understand at trial, and this was an expedited trial, is that correct? That's correct. That both sides presented to the court the hypothetical monopolist theory, is that correct? The government presented a hypothetical monopolist theory. The court went more the brown shoe factors. Well, the court indicated the important role that it thought the hypothetical monopolist test played an important role in antitrust cases. It mentioned that in its geographic market analysis. But it didn't seem to decide the issue on hypothetical monopolist theory. Well, it didn't reference the test in its product market analysis, but that's exactly where the court's error, the misapplication of the test lies. The test analyzes an entire market, both its product and its geographic market components. For the court to reference the test's importance on the geographic market side is to apply one half of the test without recognizing that the way it operates is by analyzing an entire market. If you were to assume, for the sake of argument, that the court chose not to apply HMT to the product market, would that, standing alone, not thinking about the geographic market at all right now, would that be valid to apply the practical indicator instead? Yes, the court could apply an alternative test, but even if putting aside the court's errors with respect to the hypothetical monopolist test, there's error under this court's decision in Allen Myland. Allen Myland addressed a market for large-scale mainframe computers, and it held that leasing companies, when they leased new computers that they had just purchased from manufacturers and were functioning as distributors for, that those leases did not belong in the relevant market because the leasing companies did nothing to increase the supply of new machines. That's exactly the error here. The court took distributors, which are simply resellers, refiners' customers, that do nothing to increase the supply of the relevant product. But the distributors aren't solely these refiners' customers, right? They also get their sugar from other refiners in the United States and around the world, which they then arbitrage when opportunities arise. So in that sense, don't they add new product? They don't, because they are collectively constrained by the supply that they're able to purchase from the refining level. The point, let me judge Porter's point, is the refining level doesn't necessarily have to be within this country. It can be outside. I mean, I'm looking at this, you know, from more of a, obviously, a layperson's, but a practical level. If producers sell to distributors and distributors get some from producers, some sugar, and some from other producers that are outside the geographic market, it sounds to me like what the producer or distributors are trying to do, let's say you're a distributor and you're selling to Heinz, and you want to keep that customer really happy. And so you probably put sort of a, what Locklear calls a speculative storage. I'm going to put some aside just in case there's a high demand that comes up, and I've got to be able to supply Heinz. For God's sake, I can't let them go unfulfilled in terms of their requirements. So that distributor then becomes, in effect, as Judge Nuriayka said, just like a producer. It has to be included in the equation because they're both, the producers and distributors, are ultimately selling to the customer, which is Heinz in my example. Am I wrong?  Practically, how am I wrong? So as to foreign supply, which is one of the features that you mentioned that distributors could potentially source sugar from, we accounted for all foreign supply. So when sugar was sold from a foreign refiner to customers located in the relevant geographic markets, that sugar was accounted for and we assigned market shares to it. We assigned 7% market shares to imports to reflect those sales. That indicates that under the hypothetical monopolist test, distributors in the relevant geographic markets would be subject to any substantial price increase imposed by the monopolist. So they would not be able to defeat that price increase. Again, it really comes back to Judge Porter's question. If that distributor can get the product elsewhere, the distributor's not really affected in terms of pricing, right? These distributors would be affected in terms of pricing under the hypothetical monopolist test. That's where the district court went wrong. True, because then you're saying the hypothetical monopolist controls the entire world. Exactly. And this is exactly the error that this court identified in Hershey, where the district court had considered contracts between the merging defendants and third parties that effectively prevented the imposition of a substantial price increase, but this court said you need to hypothesize a monopolist. That is part of the exercise, and that's exactly where the district court here went wrong. It answered the wrong legal question because it failed to posit a monopolist controlling all supply. I guess what I'm wondering, though, is if you're assuming that the district court must apply the HMT to the product market analysis, where in Hershey, we made clear that it does not. It can use Brown-Chu instead. It has the option. It actually probably can do one or the other or probably both if it wants to. So two responses. First, I do think there's a misapplication of the test in applying it to one half of the market without recognizing that the test tests the entire market. The district court also failed to reference the test in its product market analysis without providing any legally or economically valid justification for doing so. The government put forward its case using a test that this court has endorsed as sufficient to establish a relevant market. Are you saying that she should not have applied the Brown-Chu factors? She could have applied the Brown-Chu factors, but given that we put forward a sufficient means of establishing the market, there should have been consideration of that means and a rejection of it on its own terms. Looking at factors that are irrelevant under the test. You're talking about the product market, not the geographic market. Correct. Looking at factors that are not relevant to the test application, such as distributors, current sales that wouldn't be possible on the same terms under a monopolist is another misapplication under Hershey. Are there any factual findings that the district court made in support of its product market decision that you believe are erroneous? We believe that the district court made legal errors, but if the court views its findings on the... Let's start with the facts. The question was, were there any factual findings that you believe are clearly erroneous? If the court views the application of the hypothetical monopolist test here as a factual issue, we do believe that it was legally erroneous and clearly erroneous because the court failed to posit a monopolist and instead considered irrelevant factors such as distributors, current sales. To stick with the facts, factual findings. Are they all okay? Are there any of them that are clearly erroneous? We are... Other than the challenge that I just mentioned, we have not based our appeal on the challenge to legally erroneous findings in the district court's decision, and that's because we think there are legal errors. This goes back to, in addition to the hypothetical monopolist points, I do want to emphasize the error in failing to recognize that distributors' role as resellers under Allen Myland means that it was permissible for the government not to treat them as suppliers. We've said that delineating the geographic market is a factual test. I don't think we've said one way or the other about the product market, but why should it not be factual as well? I mean, you've got experts testifying. They can't testify to matters of law, right? They're testifying to matters of fact. Well, this court said about the geographic market in Hershey that it involved the application of legal principles to factual findings, and in Hershey, there was de novo review because the errors were in the application of legal principles. That's exactly the kind of error that we think happened here. There was error in misapplying Allen Myland based on that failure to recognize distributor status as resellers. There was error under the hypothetical monopolist test in failing to recognize the test application to both sides. Okay, let me just ask it this way. If you were writing the rule for us to determine the product market, is that a factual test or a legal one? I would, I believe that the rule from geographic market applies here, which is that while there are factual components to the test, there's also an application of legal principles and where there's a misapplication of those principles, that's reviewable de novo and reversible. Let's just hang with product market right now. Your product, suggested product market was the producers, the production and consuming or sale of refined sugar, is that right? Correct. And the court suggested that it should be producers, distributors, and consumers. The court held that distributors should be treated as suppliers in our relevant markets, yes. Correct. And we talked about that previously. What's so factually erroneous with respect to that? What's factually erroneous is the failure to appreciate the import of distributors' role as resellers, as entities that do nothing to increase the supply of the... The judge did appreciate how important the distributors were in this chain. It's true that the district court did make a factual finding, paragraph 34, about the role that distributors play in that they purchase refined sugar and resell it, but we think there was a legal error in failing to recognize the import of that fact. Why shouldn't the product just be... We're talking about a basic commodity here. Why isn't the product refined sugar? Who cares about producers, distributors? The consumer, and after all, we're talking about consumer welfare, they don't care about all those intermediate middlemen and so on. They just want sugar at a good price. At a good price. I think that's a fair way to look at it, and there's a finding that the district court again made that there are no reasonable substitutes for refined sugar. So whether distributors are considered as a product market question or whether it's a separate question as to whether they are participants in the product market, it's the error in application of Alan Miland and the hypothetical monopolist test that demonstrates where the district court went astray. So the court made a factual finding that distributors are participants in the product market. How is that clearly erroneous? It is... Well, our position is that it's legal error because it fails to reflect the Alan Miland principle that where entities are resellers that do nothing to increase the supply of the relevant product, it's permissible not to treat them as suppliers. Again, I keep coming back to Judge Porter's question. The supply can be increased by just going outside the United States if you're a distributor. It cannot because of the way we accounted for foreign sales. So again, any distributors located inside our relevant geographic markets, we accounted for foreign supply that they were receiving. We assigned market shares to that supply. So if there were a price increase on that supply, distributors would be subject to it. They couldn't rely on it as a source to defeat the price increase. We also looked at what's called arbitrage. Sales from customers, including distributors located outside of the geographic markets, to customers inside the geographic markets. The concept of substitutability. Yes, that this is an alternative source that could defeat the geographic markets. And there again, we concluded that those sales would not be sufficient to undermine our geographic markets. So foreign supply was accounted for in the way we defined our markets, the way we applied the hypothetical monopolist test, and it didn't defeat the markets as we defined them. I would also like to note some of the practical issues that come with holding that distributors should have been assigned market shares. Allen Milan makes clear that double counting in the assignment of market shares isn't appropriate, and that's one way that distributors' sales could have been accounted for here. If sales from refiners to distributors were assigned to refiners in their market shares and resales by distributors were assigned to distributors, that's double counting of the sort that Allen Milan condemns. The defendants have proposed an alternative in which sugar sales from refiners to distributors would be subtracted from refiners' market shares. But that ignores Brown-Chu's command that market definition has to reflect competition where, in fact, competition exists. There's competition among refiners for sales to distributors. We can't ignore that as part of our common market. There may be competition between producers and distributors with respect to sales to customers. The customer, I mean, again, I keep coming back to questions that Judge Porter asked. He's saying the customer wants it at a good price, doesn't really care where you get it, could be a distributor, could be a producer. And we think that those facts are not going to the relevant legal question, not responding to the fact that distributors are refiners' customers in this market. There's a long line of Supreme Court and Third Circuit cases that have treated relationships between suppliers and distributors as vertical relationships. We think it's not reflecting the need to posit a monopolist that would control the terms under which sugar is sold to distributors, the prices they're paying, and potentially the terms of receipt. Again, focus on the practical. Judge Nuryiakas said that 25% of the sales to customers in the national market are from distributors. And you were trying to say, I think in your opening brief and your reply brief, that if you look at the national market, it's 31%. So you're trying to get the presumption that there's anti-competitive effects. But if you have 25% of that 31% coming from distributors and not producers, that takes 25% off of 31%, which gets you right around a little over 23%, I think. So, I mean, looking at this again anew, it seems like if you're the government, you're trying to say, okay, I've got to get the narrowest geographic market I can, even though I'm working maybe backwards. And that may explain why you at trial, I think, focused on geographic market first. Is that correct? In our post-trial briefing, we briefed geographic market first, correct. And so I get the picture, but when you include distributors in there, it becomes a different ballgame, a different analysis. A couple of points. You referenced the 31% market shares in the national market, but the market shares in the other proposed markets were higher, up to 54%. The court didn't buy that in connection with the product market. The court did not think that those markets were properly defined. In our briefing and at argument, we expressed disagreement with that view. But regardless of the geographic market in which effects were analyzed, there was a prima facie case. Now, this is true even putting aside the market shares because of our evidence of unilateral and coordinated effects. Unilateral effects goes to the effect of eliminating Imperial as an independent competitor, regardless of how other firms would respond. And coordinated effects goes to the increased incentives. Imperial was a struggling company, and it needed to get some type of bailout, did it not? The district court made some findings that Imperial was a struggling company, yes. But, again, coming back to the big picture here. You're Heinz, and the product is this commodity called refined sugar. Does Heinz really care if it gets refined sugar from the Georgia Plus area or the larger area that you talk about in the southeast or nationally? I mean, Heinz probably doesn't care if it gets it from California or even if it gets it from somewhere outside this country. That may be right, and that's exactly what we accounted for in our geographic markets. Our geographic markets are broad markets that included supply from all producers, wherever located, that sold to customers located in those markets. So if Heinz is located in our geographic markets, regardless of where it purchased from, we assigned market shares to the entity that was making those sales. This is exactly what the district court failed to engage with. It thought that we hadn't accounted for sugar sold by refiners outside of our markets, but customer location-based markets of the kind that we defined here, the kind that this court approved in Hackensack, account for precisely that. That's one of the sources of error in the district court's opinion. Is it exactly that she didn't account for it, or she thought the evidence contradicted your hypothetical? I would say that she didn't account for it, because the fact is that our geographic markets include supply from any refiner, wherever that refiner is located. So a failure to recognize that fact is a misunderstanding of how customer location-based markets operate. It's not a question of consistency with the evidence. It's a question of legal principles, such as those discussed in Hackensack, where the court approved a market where services were provided to residents of a county, including by hospitals outside of it. That's precisely the type of market that we defined here. The test applied by the court was essentially brown shoe. Is there any authority that you know of that says that if you present the HMT theory, the court must deal with that and not apply brown shoe? Not authority directly making that point, but we do think that Hershey and Hackensack demonstrate that the test is a sufficient means. Well, Hershey and Hackensack do not apply the HMT. I mean, they talk about it. They do apply the HMT. I'm sorry. They said that people agreed that it applied so they didn't have to make a decision. On that issue. But they then go through and actively approved the relevant markets that the government put forward in that case based on the fact that they passed the hypothetical monopolist test. That's a demonstration that the test is sufficient as a means of proving the markets. Here there's no legally valid reason. Clearly it may be sufficient. I agree with that. But the court isn't consigned to use that as the only test. It has the option of applying brown shoe, does it not? Correct. Yes. But when the court does apply the hypothetical monopolist test, it has to do so correctly. Failing to recognize that the test analyzes the product and geographic markets together is a form of misapplication. And there's the independent misapplication that I've addressed regarding Allen Mylands, failure to recognize distributors as refiners, customers. What if the district court opted to apply brown shoe and address the product market first and stopped there, didn't continue to look at the geographic market? Would that be okay then to forego applying HMT altogether? Our argument is not that it's necessary to apply the HMT, but where the court acknowledged the test's importance for one half of the market analysis without recognizing that the way the test operates is by testing the entire market, that's a misapplication. So if you use it, you have to use it for product and geographic markets? Correct. And you have to reach both even if one fails? You may not have to reach both questions, but when you're applying the test there does have to be a recognition that it operates by testing the product and geographic markets together. I'm sorry, but is that in the guidelines or is there case law to that effect? Where would we go to find a proposition that says you have to apply, you can't mix and match, you have to do it for both markets? That is in the guidelines, section four, which both. I'm looking at it. Could you? Sure. If you don't have it right away, perhaps you can deal with it on rebuttal. Yeah, that's fine. It's a question that needs to be answered. Sure. Well, it's the sentence in the umbrella part of section four that says the hypothetical monopolist test is applied to a group of products together with the geographic region to determine a relevant market. The D.C. District Court and FTC made this point. Are you looking at 411, 412, 413? It's just the umbrella part of section four before section 4.1. It's at the very end of that chapeau. The hypothetical monopolist test is applied to a group of products together with the geographic region to determine a relevant market. And both Hershey and Hackensack look to the guidelines in determining how the test operates. This is a point that defendants recognize as well, page 43 of their response, that the test operates by testing a product market within a defined geographic area. There was a misapplication in failing to apply it that way here. Any further questions right now? We'll get you back. Thank you. Ms. Sherry. Good morning, Your Honors. May it please the Court. Melissa Arbasheri here on behalf of the defendants. I want to start where counsel left off. I would point you to the exact same place in the horizontal merger guidelines because it shows the disconnect in their theory on the hypothetical monopolist test. They argue essentially that you need to imagine when you're talking about product market, you have to imagine a worldwide monopolist. So there's only one refiner in the entire world, and so distributors are stuck buying from that one single refiner. But as they just quoted to you, that's not how the hypothetical monopolist test works, even in their own guidelines. You have to look at the product market in the context of the geographic market. And so what geographic market do we have here? We have the regional ones they defined. And so to get back to all of the questions, when you look at the facts, in those regional markets, distributors have lots of different options. They have suppliers outside of the regional markets. They have imports. More than 50% of distributors' refined sugar comes from imports. Now, your suggestion was that the market be national, and the government ultimately accepted that, saying if it is national, we still win. Can they go outside the national market easily? I mean, they can. Again, more than 50% of their refined sugar is coming from imports. But I do want to address that argument they made because they don't seem to do all that much to defend their regional markets on appeal. Instead, they like to fall back to this 31% that you mentioned. And I think it can't go without saying, I mean, they tried their entire case based on regional markets. All of the discovery leading up to it was focused on – They're trying to get the biggest percentage in the smallest market. Exactly. I get it. And one could say, okay, it's their burden, so if they keep going with Georgia Plus or the southeastern larger market, they're kind of stuck with that. But going back to my days, let's say you and I are against each other in a case, and you say it's X and I say it's Y. And finally, I say, okay, let's assume, Ms. Sherry, it's X, I still win. What's wrong with logically saying that in the antitrust area? So here's the problem with saying it. They said that in the post-trial brief. So after trial, all the discovery, all the evidence is in. In the post-trial briefs for the first time, they said in like two or three sentences, on page 22 and 23 of their brief, look at this. The problem when you do it so late is you don't have the evidence in the record to point to. So let's look at the evidence they point to support the idea of this 31%. It's three pages. It's in the joint appendix, page 930 to 932. These are three pages from Dr. Hill's cross-examination, and literally all they say about it is look at figure 23, add up these two figures. Does it equal 31%? Yes. Is 31 more than 30? Yes. So where's figure 23? You know, where do these numbers come from? It's not in the record. There's nowhere in the record that shows where that 31% comes from. There's no methodology. There's no explanation of it whatsoever. And so the problem with coming up with this late-breaking theory to try to save your case is you don't have the evidence to support it. As the district court recognized, there was nothing the court could do with that, such a conclusory statement, you know, after the fact. What is the court supposed to do? Really say that there's a presumption based on, you know, five lines of transcript in the testimony? Well, I guess what they have to do is they have to try to eliminate distributors. Well, I mean, so let's focus on the distributor. I mean, the idea of Heinz, right, the question for purpose of the product market is cross-elasticity of demand, right? Are they substitutes? Are they reasonably interchangeable? And refined sugar absolutely is the product. So is there a difference between distributor-sold refined sugar and refiner-sold refined sugar? It's the exact same product. You look at it from the basis, from the viewpoint of the customer, you're right. But they're, I guess, trying to look at it from the viewpoint of the supplier, are they not? Well, they do want to talk about supply now. I mean, but that's another problem, right? They came in, they didn't come in with a production-defined market. And the reason they didn't focus on production until now is because what they really cared about was production. Then all of United sales from the three other members wouldn't be included. Because while the United is, you know, united, for lack of a better word, when it comes to sales, the members are not united when it comes with respect to production. They have different incentives when it comes to production. And so that's why they identified a customer-based market. They focused on sales. And when you look at it from the customer's perspective, it really doesn't matter. Now, just to correct one thing, they claim that we've already accounted for imports, right? Seven percent of the markets are imports. And so even though distributors can easily purchase and do purchase from imports, don't worry about that because it's already accounted for. It's not. All they've accounted for in the seven percent is imports that are going directly into these two regional markets. So Indiana Sugars, which is outside the regional markets, when they get imports and they sell in to the southeast, those sales are not being accounted for at all. So no double-counting problem, no issue. They're just not being accounted for. And so they absolutely have left distributors out of the market. And really the only argument that they have as to where the district court could possibly have committed a legal error, because they now admit that they're not challenging any of the factual findings, is to come back to this idea that, you know, you have to look at it under the hypothetical monopolist test. And not just – Although at trial, I mean, you focused on the HMT as well, did you not? We did. And, you know, to go to your questions about doctrine, I don't know if I view them as two totally distinct arguments. I mean, it has to be – the markets have to be consistent with commercial realities. That's what the brown shoe says. That's what this court said in Hackensack and Hershey. And it didn't say that to the exclusion of the hypothetical monopolist test. I mean, the purpose of the hypothetical monopolist test, it's one way to test out the hypothesis, right? Here's the commercial realities. This is what I think the market is. I'm going to use this test to see if it's right or not. And the problem with their reliance on appeal, like so much on the hypothetical monopolist test, number one is it doesn't exist in the abstract. So what evidence is there about why their markets, you know, pass the hypothetical monopolist test? All they have is Dr. Rothman, their expert, the same expert that the district court found to not be credible, not be persuasive. And you look at how he applied the hypothetical monopolist test, and his transcript is in the joint appendix, I think almost the entire transcript except for a few pages. It starts on JA 545. You can read it cover to cover and not really know what methodology he used to apply the test. You can read it. You won't see any quantification, you know, what SNP could be imposed, how, why. All he says is, I don't really think arbitrage is going to be a big issue. It's not going to be sufficient enough to defeat a SNP here. Why? Well, for the same assumptions that were proven false at trial, because transportation costs are prohibitively expensive, sugar doesn't flow easily through the country, we don't think distributors are real competitors. I mean, that is the hypothetical monopolist test they're riding on now. When you were preparing for this expedited trial, what was your thought process in dealing with the hypothetical monopolist test primarily? Because the government did it and you felt you needed to rebut it, or because you thought independently that's where one should start? Well, I think I wouldn't say that's where we thought one should start. I think one should start always with the commercial realities. And to be clear, our expert, Dr. Hill, didn't do a separate independent hypothetical monopolist test. Dr. Rothman had done one, and we explained why that test was flawed. One, because it was inconsistent with the commercial realities. And two, and it's sort of the same point, is that he just didn't properly account for arbitrage. And, you know, the government says there's no, you know, the district court somehow didn't make any arbitrage findings. I mean, that's in their reply brief. But that is exactly what the district court was focused on. Paragraph 101 is a very explicit finding when it comes to arbitrage. There are ample opportunities to look outside the market for customers to look outside the market in order to purchase refined sugar in the event of a price increase within the geographic markets. How would you answer the question I asked your friend about the product market, delineating the product market? Is that a factual matter or legal or some combination? It's a factual matter. I mean, you know, like anything, what the court really was saying at Hershey is market definition is a question of fact. It's true whether it's product market or geographic market. Of course, if you get the law wrong in doing so, then, you know, that's a legal error. It's subject to plenary review. But, you know, at Hershey it was quite different, right? At Hershey the district court said I'm applying the hypothetical monopolist test. But, in fact, the test that the district court applied was this Elzinga-Hogarty test that had been discredited, at least in the merger context. And then even with respect to that test, it only applied to one half of the test and not the other, and there were other sort of legal errors to that effect. There's nothing like that here. I mean, the district court made factual findings. I think the only legal error they've tried to articulate is the fact that the court didn't apply the hypothetical monopolist test with respect to the product market, but neither did their expert. Their expert applied it looking at the two together. And the district court did talk about the hypothetical monopolist test when it came to geographic market, and it just said it doesn't work because of the arbitrage opportunities, because it would be very easy to defeat any SNP in this context, because customers already do go outside the market to purchase their sugar. They would continue to do so. There are, I think, more than 75% of the sugar sold into the southeast are to customers that even have locations outside of the regional geographic markets, and so they would just go pick up their sugar from there. So going back to your themes at trial, did you emphasize HMT, or did you emphasize brown shoe factors? The brown shoe factors. And actually, so did the government. I mean, that's the other strange thing about this appeal, is if you look at the complaint in this case, if you look at even Dr. Rothman's testimony, if you look at their closing argument, post-trial briefing, it is all about the brown shoe factors. They used the hypothetical monopolist test as like a third factor to kind of support what they've already said with respect to commercial reality, but their focus from the very beginning was on commercial realities. And, in fact, the premise when they brought this case was all about transportation costs. It makes sense to look at a regional market because the transportation costs are prohibited. It was all about sugar not flowing easily throughout the country. And that's why the district court came out where it did. It's not that it disagreed with them on the law or on the hypothetical monopolist test or economic theory. It's because it disagreed with the government on the facts because of how the evidence came out at trial. And as it stands now, those factual findings are not disputed. If the court had applied the hypothetical monopolist test, that assumes a single hypothetical monopolist owns all the firms globally. And the court then focused on distributors, but how could distributors possibly compete with a hypothetical monopolist that controls global sugar production? So where I push back is the word global. That's not how the hypothetical monopolist test would work here. It would assume that a single refiner owns all refined sugar in the proposed regional geographic markets that the government defined. You don't zoom out to a worldwide market that no one has ever suggested. And if you did, the test would always be satisfied in the circumstance. But the question really is a practical one, right? Whether it's in hypothetical monopolist test terms or more generally, you're just trying to see if the price can be increased or whether there are other market factors at play that would add. But the district court focused on imports. So that does talk globally, does it not? Well, it does. But it also, you know, is into the regional geographic market. So the focus on imports was the idea that, as you mentioned, distributors are 25 percent of the market. More than 50 percent of their refined sugar comes from imports. And so it's just one of, you know, many examples that they have other suppliers available to them. And that's why they're able to compete within these regional markets. The other thing that the district. So you're saying that the government's proposed market would not pass the HMT? I think absolutely not. If you account for arbitrage, as I think everyone recognizes, required to be accounted for. You know, the government, again, is responsive. It's just to say there's no such findings in arbitrage. There are. That's kind of a garbage in, garbage out thing, right, when doing the HMT. If your factual assumptions for doing hypothetical don't align with commercial realities, your HMT is not going to work. There's nothing magic about doing an HMT, right, if the commercial realities don't line up with your assumptions. That's exactly right. I mean, it's an input question. So if you do an HMT based on the idea that sugar doesn't flow, you're going to come out with the wrong result. And I think if you look at Dr. Rothman, he gave an example of how it is supposed to work. And he gave an example of milk. So, you know, you have milk on one block. If the price for milk goes up on that block, what's going to happen? Are customers going to go to the next block? If so, you broaden the market. And you kind of keep going through that exercise until you define the correct market. The problem is Dr. Rothman didn't do that. I mean, Dr. Rothman took the government's markets as he gave them. He didn't test them. He took the government's assumptions with respect to transportation costs and the like. He didn't, you know, look at or consider the contrary evidence that came in on the record and garbage in, garbage out. And that was the problem with the test here. And that's why when I think of commercial realities, they're not, you know, two distinct concepts necessarily. The market has to be consistent with commercial realities. But it's one way to test whether or not that's true. What do you say to the argument that it's legal error to purport to do an HMT analysis with respect to geography but not product market? Yeah, and that's never, I mean, that's not the law that's never been their position. And the HMT, I mean, the horizontal merger guidelines that they read to you, it doesn't talk about doing an HMT. And, in fact, the part they read is right before, and this is at the end of Section 4, it's right before 4.1. Yeah. What it basically says is, okay, we're going to go on and we're going to talk about product market on the one hand, and then we're going to talk about geographic market. But to be clear, these are not two completely separate and distinct concepts. And when you apply the hypothetical monopolist test, it's applied to a group of products together with a geographic region to determine a relevant market. And so it's not like you look at product market in the abstract, apply some test to it in a worldwide hypothetical monopolist situation. You look at it within the regional geographic markets. I think the other way to look at it when we're talking about product market and you look at the case like what is the test for product market, whether there's reasonable interchangeability is whether there's cross-elasticity of demand. The district court made a finding with respect to that. That's a JA-52. And it's for all the same reasons we've already discussed, because distributors in this market, I know they like to say they're just resellers, but the facts proved otherwise. There are a lot more than just resellers. We've talked about the diversity of supply, but there's also the example you gave with respect to saving up storage. I forgot what you said your law clerk called it, speculative storage. Distributors buy in large quantities. They have the ability to store it, and they do store sugar, and they're able to move it across the country to areas of demand. That's something that United, for example, can't do. United has the obligation to sell all the sugar from its members each year. And so that's another reason they have this ability to compete within the market. And so unlike all the cases they like to point to where you have distributors or resellers who don't have that ability to compete, here the factual findings show that they're more than able to compete with refiners in these particular markets. Your friend keeps referring to Allen Mylan. Can you say a few words about how that case applies or doesn't apply here? So I think Allen Mylan helps us a lot, because what it shows is it's not an on-off switch. You know, you look and see how distributors fare in the market, whether they're a competitor or a strain. And what Allen Mylan did is a very nuanced analysis and said, in certain circumstances they are, in other circumstances they're not. When they are, we need to actually include them in the market. That's the analysis the district court engaged in here and said, in this industry, in this market, they are a competitive restraint, and so they should have been included in the market. I think, you know, one way to, at least I've been able to conceptualize this, is take a step back and think of their argument that distributors, I mean, it's really categorical, right? Distributors are never competitors in the market. That can't possibly be right. I don't even think they would defend it. I mean, if you imagine the situation where Imperial were to enter into a price-fixing agreement with Indiana Sugar as a distributor, and they agree to fix prices for customers, I mean, the government would be the first one coming in here and saying, it's a horizontal restraint, it's per se liability. The point is the facts matter. The district court made fact-finding here. That fact-finding is not challenged on appeal. Looking at this case from afar, since Brown Shoe came out in 67, there's been a lot of academic criticism. There's been some judicial criticism. Is it your view that Brown Shoe should ultimately be put aside for something like the hypothetical monopolist test or not, and why? I don't think it should be put aside. And, you know, I'll start with the governing Supreme Court law, you know, as the first point. But even putting that to the side, you know, putting that to the side, putting this court's decision to the side, it still is part of the analysis. Now, I recognize that there's some idea that you want some more quantification maybe, right? It's a little too vague. One of the basic criticisms is it's too mushy. You have a result, and you sort of work your way to getting to that desired result. And so that's the criticism, and, you know, maybe some of the factors are more indicative than others. You know, I think the idea of distinct prices and stuff still has some force in this area, but there's other factors that some have thought are a little bit too mushy in that respect. But it's still, you know, the guiding force behind these cases. And in instances where there are, you know, ways to quantify it, great, the government should put on. If you were writing this, you're the boss, and you're setting up the test, would you follow Brown-Hsu into the future or not? I would. I would say it still needs to be consistent with commercial realities. There are different ways to test that. And to the extent there's ways to quantify it and test it, that informs the analysis. But whether or not, you know, that is done and whether it's done in the correct way is up to whoever the plaintiff is, and so the government in this case. And the problem here is, you know, number one, they went forward on the theory underlying Brown-Hsu. They chose to put forward a hypothetical monopolist test to confirm what they said the commercial realities are, but it's the garbage in, garbage out problem. All they have is Dr. Rothman. I mean, that is the hypothetical monopolist test they have. It has nothing to do with an independent product market like they say now. I mean, he doesn't do that analysis either. If you look at, in the joint appendix at page 555, that is how he describes what he did for the hypothetical monopolist test. And he says, I looked at it in the two markets that the government identified, the regional markets. And so this idea of a worldwide hypothetical monopolist, like that isn't in the record anywhere. Nobody did that analysis. Nobody should have done the analysis because that's not how the test is designed to work. So you're suggesting you would leave in place the possibility of testing something under Brown-Hsu factors or testing something under HMT. Is that correct? I wouldn't separate them out. I mean, to me, it's the input. I think the commercial realities have to be the inputs into the hypothetical monopolist test. I think that's one way to test it. But in terms of the test, there could be two tests depending on the commercial realities. I think there can be. And I think, you know, it depends on how the plaintiff chooses to put on the case. I think that the court, you know, made the point in Hershey, I believe it was, that the parties there agreed that that was the right test. And so that's fine. But it's not the only test. And I think it's important to leave that open. Well, I think. Yeah. But so when do commercial realities point to Brown-Hsu? And when do commercial realities point to the better test being HMT? Again, I don't think they point to two different tests. I just think you have to consider. You're preparing for a case. Right. And you've got certain facts. And your client's telling you here's what it is, here's what the government is suggesting in its complaint. And you've got to figure out how do I go about attempting to rebut that because I'm representing the defendant here. When is it that you would prefer to use HMT? And when is it under commercial realities, what commercial realities would cause you to say I prefer to go the Brown-Hsu factor? Well, I think it probably depends on the type of market. And I'm not going to get more nuanced than that because I'm sure I'll mess up the, you know, economics of it all. But I think there are some markets and how they're defined that maybe are more amenable to a hypothetical monopolist test. I mean, it's the same way that. Healthcare systems. Like healthcare systems. Yeah. Because, I mean, that's a good example, right? The test that was discredited with respect to mergers there was in part because of the unique nature of the healthcare market, how it's a two-stage market. And I think that's probably true in other circumstances where it may lend itself to some markets. There may be other tests that are more appropriate in other markets. And so I think, you know, someone that's an expert would have a better sense of what test is best suited to figure out what the commercial realities, in fact, are and make sure you define the market. If you look at Dr. Hill's testimony, I think he does a nice job sort of explaining the way you go about it and how it's a holistic inquiry. And there's qualitative inputs and there's also quantitative inputs to try to figure out. If it's healthcare, let's say that the cardiothoracic specialty is at the Cleveland Clinic and people come from all over the world to go to the Cleveland Clinic as opposed to just a regular hospital. And you have that type of situation, which test do you think fits better? I, again, I think it's a little bit of both. I don't view it and others may disagree. I don't view it as an either or. I'm asking an academic question like at a colloquium. Right. But I'm trying to get some background as to how council goes about thinking about these things. And do the academics make the call here? Does council make the call? I think it's probably a little bit of both, right, that the council will look at it. But I think usually and hopefully. Relying on both. Yeah, and hopefully in consultation with an expert, right, an economics expert who can look at the market and see, you know, both what the commercial realities are, which we can all, you know, look at and see. But there's more to it. I know, you know, there's a criticism that it's too mushy. But you can look at price differentials throughout the country. Dr. Hill did that here to see whether there's a difference or whether the price, you know, is equalized. And can look at other things along those lines that aren't, you know, strictly the hypothetical monopolist test, but ways to measure whether it makes sense to focus on a regional market, for example, instead of a national market. And there are things like, you know, transportation costs, convenience factors that comes up in the healthcare market a lot. Other reasons why, you know, it's a perishable item. Think reasons why you would define a regional market. And I think those are the kind of things that council probably on the government side and the defense side will look at in trying to first identify the market and then test it to see if they really have it right. And so I'm not meaning to avoid the question. I just don't want to pretend that I have the expertise to know in a healthcare case or any other case what the right way to go about it is. I think in a lot of cases, you know, that have come to this court, the parties have joined issue on the way they've done it. It's been litigated in one way and there wasn't a fight about the test. And I think that's probably true actually in a fair number of cases where there's a lot of evidence. There's a lot of input into what the market should be. And the fights tend to be things along the lines of, you know, should this be included? Should this be excluded? You have to zoom out a little bit more. What are the arbitrage opportunities and the like? Do you foresee a case coming up in the near future where somebody may attempt to take to the Supreme Court the issue of whether brown shoes should any longer be used? I think it's possible. I don't know if I think it's likely. It does seem to be, despite the academic criticism, accepted enough as at least one thing you look at. Judicial criticism, for example, the dissent of Judge Kavanaugh, then Judge Kavanaugh. There is, although, you know, he also recognized, right, that market definition is a necessary predicate and you have to start with that. And so you can imagine it going up. I sort of suspect the question would maybe be more whether it's the be-all and end-all as opposed to whether you have to consider commercial realities at all. But, you know, you can imagine it going up. I don't feel like it's going up any time terribly soon, but I could be wrong about that. I mean, I think in the antitrust context, right, people's views on economics change, the economic literature changes, and the case law at the Supreme Court level tends to develop in reaction to it. That's the, you know, per se and rule of reason cases have kind of developed in that fashion to take into account new, you know, views on economics and, for lack of a better phrase, commercial realities as we face them today. It almost looks like, colloquially, brown shoe is kind of in the bullpen, and if HMT either doesn't seem to work or you have questions about whether it should work, you bring out brown shoe. That might be true. I mean, I have to say, you know, I think this is not the case, honestly, to deal with those deeper doctrinal questions because I just don't think it's presented here. There was no, I mean, the government is the one that pushed the commercial realities theory below. They did layer on the HMT a little bit on top of it, but not with respect to product market exclusively. And what was their HMT? It was Dr. Rothman, you know, an expert who was found not credible and not persuasive. And so I think there are, you know, in antitrust law generally, there's a lot of really interesting legal and doctrinal issues, and the law has developed some in this area. I just don't think this case is one that presents any of those legal issues. It is, I think it's the 11th Circuit case in Englehart that we quoted in our briefs. This is just like any other civil case. It's just one where the government failed to meet its burden of proof. It really is a failure of proof case, plain and simple. They came in with a theory. They litigated that theory. They presented evidence on the theory, and the trial court just, you know, And so I think there will certainly be other cases that will hit on these legal issues. I don't think this is the one. But insofar as the law is concerned, the court did use the Brown-Hsu test. Yeah, but yes, but didn't ignore the hypothetical monopolist test. I mean, they sort of suggest that with respect to product market, but again, they never presented a hypothetical monopolist test that just focused on product market. And the court absolutely talked about the hypothetical monopolist test when it came to geographic market. The reason it didn't credit that test, or at least Dr. Rothman's performance of the test, was, number one, Dr. Rothman himself was not persuasive or credible, but also, number two, because he based his conclusions on the idea that there were no sufficient arbitrage opportunities and an extensive factual finding she had found to the contrary. And so in that sense, I don't think it's fair to say that the district court ignored the hypothetical monopolist test or treated it any differently. It recognized the commercial realities, but it also found that the only test they presented was from an expert who was not credible and who made an arbitrage finding that was inconsistent with the facts at trial. Any further questions? Thank you very much. Thank you. Shabazza. Thank you. I want to talk about some of the practical issues, the commercial realities questions that your honors raised and have discussed. Well, it's critical that you do that because that's where the district court went. Yes, and the critical commercial reality here is the starting point of this case. This is a merger among refiners, a horizontal merger among competitors that operate at the same level of the supply chain. That means that under Brown Shoe and under Philadelphia National Bank, market definition has to capture the area where the merger's effect on competition will be direct and immediate. It has to capture competition where competition exists. Here the competition is at the refining level. That was the starting point for our product market analysis. We tested that market using the hypothetical monopolist test, and that is the basic commercial reality, along with the fact that distributors function as resellers in this industry, not at the refining level as customers. That demonstrates the appropriateness of our approach to product market. The other critical practical point here is that the effect of the district court's failure to follow Allen Milan, the effect of its requirement that we treat distributors as suppliers, is that even a merger to monopoly among sugar refiners could pass muster under Section 7 so long as independent distributors continue to operate after the merger. It's like saying that in a market in which Apple and Samsung compete, Best Buy also competes, adding in that extra layer of the supply chain that it was appropriate for us to exclude. I want to address counsel's discussion of Allen Milan a little bit, because Allen Milan drew a distinction that is critical here. It distinguished between the leases of new computers made by leasing companies and leases of used computers. The critical point about used computers was that they were often reconfigured before they were leased out to the market again. There was an effective increase of supply based on what the leasing companies in that case were doing with respect to used computers. The pertinent holding of Allen Milan is its treatment of new computers, computers that were purchased from manufacturers and sold down the supply chain, just as distributors purchase sugar from refiners and resell it. We think that's where the court needs to look in identifying the legal error here. I also want to address the geographic market questions a bit, and in particular to point to one of the basic errors that the district court made, which was to find that it was simply not credible. If we disagree with you on the product market, do we even have to get to the geographic market? Yes. I think even if the court disagrees with us on product market, we made out a prima facie case in any plausible geographic market based on our evidence of unilateral and coordinated effects. That evidence shows the effects of this merger on competition, even in a market in which distributors are treated as suppliers. So we think that the court does need to reach that issue, and that there's reversible error that we did establish a prima facie case, regardless of the product market resolution. On the geographic market issue, I do want to address the district court's statement that it was simply not credible for our expert to testify that a market consisting of six states was just as relevant a geographic market as the entire United States. We think that that's plain legal error under the Supreme Court's decision in past, which recognized that multiple geographic markets could qualify as relevant markets. It defined a single state market, a three state market, and the entire country as relevant markets. But that wasn't your theory of trial, right, in terms of geographic market? We did put forward two overlapping geographic markets. But not national. I'm sorry. Not national. We did not put forward a national market. Defendants did, and we think we proved our prima facie case there as well. And in any event, this also reflects another misapplication of the hypothetical monopolist test in that the court failed to recognize that the test analyzes whether a market was too narrow. To prove it as what? You had to prove it both on product market and on geographic? How do you prove a prima facie case? You prove a prima facie case by showing anti-competitive effects in a relevant market. In a relevant market, both product and geographic. Correct. And we did that both through market shares and market concentration. That goes back to my question. If you don't prevail on product, then isn't the game over? Well, if we don't prevail on the point that our treatment of distributors was appropriate, we still can prevail because based on unilateral and coordinated effects, we showed anti-competitive effects in any market, even in any plausible market proposed below, including one that does not treat distributors as suppliers. I also want to address, just to clarify quickly, the treatment of imports. I heard counsel say that we did not include distributors in our treatment of imports, but foreign sales, sales by foreign refiners to customers located in the geographic markets, including distributors, were assigned market shares. We assigned a 7% market share to the imports category that accounts for sales to all customers in the geographic markets, including distributors. What about foreign sales to distributors in, let's say, Wyoming? Those were addressed through the arbitrage analysis, which looked at whether sales from out-of-market customers, including distributors, to customers in the geographic markets could defeat a substantial price increase. So we accounted for them in that way, and the conclusion, again, was that they could not defeat our relevant markets. On this arbitrage issue, I want to emphasize that the district court did not make a finding on arbitrage. If you look through its geographic market findings, they relate to sales by refiners from outside of the geographic markets to customers located in them. In footnote 16 of its opinion, it says that it's not in its geographic market analysis addressing sales by distributors. So there's no arbitrage finding in this opinion that would undermine our geographic markets as we put them forward. Unless there are any further questions, we request that the court reverse and run now. Thank you. Thank you very much to both counsels for very, very well-presented arguments. And we would ask that a transcript be prepared of this whole argument, and that you would split the costs, if you would, please. Thank you for being here, and we'll take the matter under advisement.